UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RIICO HOWELL,

                    Plaintiff,

        -v-                                          CIVIL ACTION NO. 25-CV-2716 (JHR) (RFT)

                                                     **REPORT AND RECOMMENDATION**

SLUTTY VEGAN, INC.

                    Defendant.

**TO THE HONORABLE JENNIFER H. REARDEN, UNITED STATES DISTRICT JUDGE:**

Plaintiff Riico Howell ("Plaintiff" or "Mr. Howell") brings this action against Slutty Vegan, Inc. (hereinafter "Slutty Vegan" or "Defendant"), alleging employment discrimination based on sex and retaliation for protected activity in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") and the New York City Human Rights Law ("NYCHRL"). (*See generally* ECF 3, Complaint ("Compl.").) The matter was referred to me on April 3, 2025. (*See* ECF 7, Order.) Defendant has failed to defend this action, and Plaintiff subsequently filed a Motion for Default Judgment. (*See* ECF 51, First Motion for Default Judgement ("Mot. for Default").) Plaintiff seeks $21,968.21 in back pay and prejudgment interest, $150,000.00 in emotional distress damages, $1,719,682.10 in punitive damages, and $52,800.00 in attorney's fees. (*See* ECF 51, Mot. for Default at 25-26, 37, 39.)

For the reasons set forth below, I respectfully recommend that judgment should be entered against Slutty Vegan in favor of Plaintiff, with Plaintiff to be awarded $242,418.80, consisting of $19,378.80 in back pay, $80,000.00 in emotional distress damages, $120,000.00 in punitive damages; and $23,040.00 in reasonable attorneys' fees and costs; plus pre-judgment

interest on the back pay award, to be calculated by the Clerk of Court from April 19, 2024 until

the date of entry of judgment; plus post-judgment interest on the judgment, to be calculated by

the Clerk of Court from the date of entry of judgment until the date of payment.

## BACKGROUND

### I.    Factual Background

Unless otherwise indicated, I draw these facts from the Complaint (ECF 3) and the

Motion for Default Judgment (ECF 51). Given Slutty Vegan's default, I accept as true all well-

pleaded factual allegations in the Complaint, except as to damages, and the well-supported

factual statements in the Motion for Default Judgment. *See City of New York v. Mickalis Pawn

Shop, LLC*, 645 F.3d 114, 137 (2d Cir. 2011) ("It is an ancient common law axiom that a

defendant who defaults thereby admits all well-pleaded factual allegations contained in the

complaint."); *Lopez v. Emerald Staffing*, *Inc.,* No. 18-CV-2788 (SLC), 2020 WL 915821, at *1 n.1

(S.D.N.Y. Feb. 26, 2020) (citing *Finkel v. Romanowicz*, 577 F.3d 79, 84 (2d Cir. 2009) (relying on

and accepting as true facts from the plaintiffs' proposed findings of fact and conclusions of law,

the plaintiffs' declarations, and the plaintiffs' complaint)).[1]

Defendant Slutty Vegan is a Delaware corporation that owns and operates a chain of

vegan restaurants across the United States. (*See* ECF 3, Compl. ¶ 15.)[2] Slutty Vegan originally

formed as a Georgia limited liability company on November 5, 2018, and converted to a

---

[1]    Unless otherwise indicated, this report and recommendation omits internal quotation marks, alterations, and citations from quoted text.

[2]    The Complaint restarts its numbering at paragraph 15 and contains two paragraphs designated as each paragraph number from 1 to 15. Unless otherwise indicated, citations reference the first paragraph with the designated number.

Delaware corporation on May 2, 2022. (*See id.*; ECF 3-2, Certificate of Conversion.) At the time of the events giving rise to this action, Slutty Vegan operated restaurants in Georgia, Alabama, and New York, and employed more than fifteen people. (*See* ECF 3, Compl. ¶ 15.) Aisha Cole is the founder and president of Slutty Vegan. (*See id*. ¶ 6.)[3]

Plaintiff, Mr. Howell, is a thirty-year-old transgender man who resides in Queens, New York. (*See id.* ¶ 14.) Mr. Howell was employed at Slutty Vegan's Bleecker Street location at 280 Bleecker Street, New York, NY 10014 from March 8, 2024, until Defendant terminated him on April 19, 2024. (*See id.* ¶ 1.)[4] Mr. Howell participated in an online onboarding course from March 8 to March 18, 2024, which included a sexual harassment training component, and began on-site work on March 22, 2024. (*See id.*) During his tenure, Defendant's managers regularly recognized Mr. Howell's excellent performance; a manager at Defendant's Harlem location named Mr. Howell "Slut of the Week," an award akin to employee of the week, and Bleecker Street location manager Priscilla Baurdette regularly assigned Mr. Howell to high-responsibility positions in charge of quality control. (*Id.* ¶ 3.)[5]

From his first day of on-site employment, Mr. Howell was subjected to repeated sexual harassment and unwanted touching by a co-worker known to Mr. Howell as "Humphrey." (*Id.* ¶ 3.) On Mr. Howell's first day, Humphrey touched Mr. Howell's backside while squeezing past him in a tight space. (*See id*. ¶ 5.)[6] Mr. Howell immediately told Humphrey not to touch him, to

---

[3]     This citation references the second paragraph 6.

[4]     This citation references the second paragraph 1.

[5]     This citation references the second paragraph 3.

[6]     This citation references the second paragraph 5.

which Humphrey replied, "my bad, my bad." (*Id.*) The following week, during Defendant's grand opening of its Harlem location, Humphrey again touched Mr. Howell below the waist. (*See id.* ¶¶ 6-7.)[7] Thereafter, Humphrey drastically increased the frequency of his conduct, sexually touching Mr. Howell on his backside and genital area ten to fifteen times on every single shift Mr. Howell worked, for a total of over fifty separate incidents throughout Mr. Howell's tenure. (*See id. ¶ 7.*)[8] Although Mr. Howell repeatedly reprimanded Humphrey and attempted to avoid physical proximity to him, his efforts were largely unsuccessful given the close working quarters. (*See id. ¶ 8.*)[9] Other employees, including co-worker Shane Oakman, witnessed Humphrey touching Mr. Howell multiple times on his backside and genital area. (*See id. ¶ 12.*)[10]

In addition to the sexual harassment by Humphrey, Defendant's employees repeatedly discriminated against Mr. Howell on the basis of his transgender identity. (*See id. ¶ 5.*) Mr. Howell was the only transgender employee at Defendant's Bleecker Street location during his tenure. (*See id.*) Team Leader Tenji, last name unknown, misgendered Mr. Howell multiple times in front of the entire staff cohort, effectively outing him to his coworkers by referring to him as "she" or "her" when shouting orders during shifts. (*Id.* ¶ 9.)[11] General Manager Jonathan Coleman was present on at least one occasion when Tenji misgendered Mr. Howell and failed to correct her despite knowing Mr. Howell's pronouns. (*See id.*) Additionally, during Mr. Howell's second week on-site, trainer Dom Wilson loudly remarked to other employees within earshot

---

[7]    This citation references the second paragraphs 6 and 7.

[8]    This citation references the second paragraph 7.

[9]    This citation references the second paragraph 8.

[10]    This citation references the second paragraph 12.

[11]    This citation references the second paragraph 9.

that Mr. Howell did not need to "manhandle the sandwich," causing Mr. Howell to feel humiliated and prompting him to develop anxiety about his appearance and gender presentation at work. (*Id.* ¶ 10.)[12]

Mr. Howell reported Humphrey's conduct to Defendant's team leaders and managers on every single shift he worked. (*See id.* ¶ 4.) Manager Crystal, last name unknown, and Team Leader Tenji dismissed Mr. Howell's complaints, laughed, remarked "it's not that deep," and told Mr. Howell that Humphrey "just ha[d] a crush on" him. (*Id.* ¶ 13.)[13] Crystal told Mr. Howell that she always saw Humphrey doing his job. (*See id.*) Mr. Howell suggested that Crystal review the restaurant's camera footage as further evidence of Humphrey's conduct; Crystal took no action. (*See id.*) Mr. Howell thereafter escalated his complaints to General Manager Coleman, requesting to be scheduled on different shifts than Humphrey. (*See id.* ¶ 15.)[14] Mr. Coleman responded that the allegations were "very serious" and would be "look[ed] into," but continued to schedule Mr. Howell and Humphrey on the same shifts. (*Id.*)

In early April 2024, while Mr. Howell was retrieving supplies from the back of the kitchen, Humphrey approached him from behind and put his hands on Mr. Howell's backside. (*See id.* ¶ 18.) Mr. Howell shouted at Humphrey to stop and immediately reported the assault to Ms. Baurdette, who was also present downstairs, and requested to leave work, telling her he felt triggered and demoralized. (*See id.* ¶ 19.) Ms. Baurdette advised Mr. Howell to draft a formal complaint and email it to Mr. Coleman. (*See id.* ¶ 20.) That day, Mr. Howell sent a

---

[12]    This citation references the second paragraph 10.

[13]    This citation references the second paragraph 13.

[14]    This citation references the second paragraph 15.

detailed email to Mr. Coleman describing Humphrey's pattern of sexual harassment and assault, copying other employees he believed Humphrey had also harassed. (*See id.* ¶ 21.) Mr. Coleman replied that he had forwarded the email to Defendant's Human Resources department. (*See id.* ¶ 22.)

Two days after the incident, a Human Resources employee named Victoria called Mr. Howell and informed him that Defendant had removed him from the schedule. (*See id.* ¶ 23.) That same day, Mr. Coleman called Mr. Howell and informed him that Defendant was suspending him pending a "thorough investigation." (*Id.* ¶ 24.) Mr. Coleman told Mr. Howell that Defendant had no claims against him. (*See id.*) Mr. Howell nonetheless informed Mr. Coleman that he understood himself to be suspended for making a sexual harassment claim. (*See id.*) Two weeks later, a manager Mr. Howell had never previously met called to inform him that Defendant was terminating his employment, citing Mr. Howell's reaction to Humphrey's unwanted touching as the basis, characterizing him as "too aggressive" and accusing him of creating a "hostile work environment." (*Id.* ¶ 25.)  According to Plaintiff, Defendant took no action against Humphrey. (*See id.* ¶ 7.)

Defendant's conduct caused significant harm to Mr. Howell's emotional and physical health. (*See id.* ¶¶ 28–34.) Mr. Howell is a survivor of sexual assault in his youth, and Humphrey's persistent assault evoked painful and traumatic memories, considerably worsening his mental state. (*See id.* ¶ 28.) He experienced trouble sleeping and eating, and found it difficult to get out of bed on many days. (*See id.*) His "depression became so overwhelming that it affected his relationship with his partner and his other personal relationships." (*Id.*) The harassment and assault also exacerbated and intensified Mr. Howell's gender dysphoria, causing

6

him to experience intense and persistent anxiety, confusion about how to present himself, and "an overwhelming sense of defeat in his day-to-day life." (*Id.* ¶ 29.) Defendant's actions exacerbated Mr. Howell's pre-existing disabilities, including depression, anxiety, post-traumatic stress disorder, and gender dysphoria. (*See id.* ¶ 2.)

Mr. Howell remained unemployed from April 19, 2024, until January 2025, during which time he was unable to afford a cellular phone or pay bills and rent. (*See id.* ¶¶ 30, 35.) Although Mr. Howell is primarily qualified to work in the service industry, he avoided other service industry work due to the trauma Defendant inflicted, despite persistently seeking other work. (*See id.* ¶¶ 30-31.) As a result, Mr. Howell, who has sickle cell trait and has exacting nutritional needs, frequently sold his plasma to afford food. (*Id.*) Mr. Howell found work at Gotham Greens in January 2025. (*See id.* ¶ 35.)

## II.      Procedural History

On October 31, 2024, Mr. Howell filed a charge of unlawful discrimination, retaliation, and sexual harassment with the Equal Employment Opportunity Commission ("EEOC"). (*See* ECF 3, Compl. ¶ 10.) On January 2, 2025, the EEOC completed its investigation and issued a Letter of Determination finding that Defendant had engaged in employment discrimination in violation of Title VII, and issued Mr. Howell a Notice of Right To Sue. (*See* ECF 3-1, Right To Sue Notice at 1-2.) Mr. Howell timely filed the Complaint on April 2, 2025, asserting claims for sex-based discrimination and retaliation in violation of Title VII, and gender discrimination and retaliation in violation of the NYCHRL. (*See* ECF 3, Compl. ¶¶ 41–60.)

Slutty Vegan was served on April 8, 2025, when Plaintiff served the summons and Complaint on Defendant's authorized agent, Corporation Service Company ("CSC"). (*See* ECF 11,

7

Affidavit of Service of Summons and Complaint ("1st Affidavit of Service").) Defendant was therefore required to respond to the Complaint by April 29, 2025. (*See id.*) Defendant did not respond to the Complaint and did not appear in this action. On May 1, 2025, I issued an order extending the deadline for Defendant to respond to the Complaint until May 16, 2025, and directed Plaintiff to serve by May 8, 2025, the summons, the Complaint, and a copy of the order by registered mail at Defendant's Delaware registered agent and to any place or places of business of Defendant known to Plaintiff, and by any email addresses used by Defendant and known to Plaintiff. (*See* ECF 12, Order ("May 1st Order").) On May 8, 2025, Plaintiff filed fourteen Affidavits of Service confirming that, on May 6, 2025, he served the summons, Complaint, and the May 1st Order on Defendant at twelve addresses by registered mail and at two email addresses. (*See* ECF 13–26, Affidavits of Service Nos. 2-15.) Defendant again failed to respond.

On May 27, 2025, Plaintiff filed a proposed Clerk's Certificate of Default, supported by a declaration of counsel. (*See* ECF 29, Proposed Clerk's Certificate of Default ("Prop. Cert. of Def."); ECF 30, Declaration of Erin Evers, ("Evers Decl.").) That same day, the Clerk of Court entered the Certificate of Default as to Slutty Vegan. (*See* ECF 33, Clerk's Certificate of Default ("Clerk's Cert. of Def.").) On June 10, 2025, I issued an Order to Show Cause directing Defendant to explain its failure to defend this action and directing Plaintiff to serve a copy of the Order to Show Cause on Defendant by June 11, 2025. (*See* ECF 34, Order to Show Cause.) Plaintiff timely served the Order to Show Cause on Defendant. (*See* ECF 37–39, Affidavits of Service Nos. 16-18.) Defendant did not respond to the Order to Show Cause or otherwise appear in this action.

On July 18, 2025, I directed Plaintiff to begin the process of seeking a default judgment against Defendant by August 8, 2025. (*See* ECF 40, Order.)

On September 12, 2025, Plaintiff filed a first motion for default judgment and supporting papers. (*See* ECF 45, First Motion for Default Judgment.) Plaintiff served the motion on Defendant. (*See* ECF 46-49, Affidavits of Service Nos. 19-22.) On October 7, 2025, I directed Plaintiff to file a supplemental submission in support of the motion that included a memorandum of law complying with Judge Rearden's Individual Rules and Practices. (*See* ECF 50, Order.) On October 22, 2025, Plaintiff filed a renewed motion for default judgment with the required supplemental submission. (*See* ECF 51, Renewed Motion for Default Judgment ("Mot. for Default").) Plaintiff subsequently served the renewed motion for default judgment on Defendant by email and through Defendant's registered agents. (*See* ECF 52–55, Affidavits of Service Nos. 23-26.) On November 19, 2025, I directed Plaintiff to further effect service at all of Defendant's last known business addresses and by all additional email addresses used by Defendant and known to Plaintiff. (*See* ECF 56, Order.) Plaintiff timely complied with that order. (*See* ECF 57, 60–66, Affidavits of Service Nos. 27-34.) Defendant has not responded to any of the Court's orders or appeared in this action.

<u>**LEGAL FRAMEWORK ON A MOTION FOR DEFAULT JUDGEMENT**</u>

I.      **Obtaining a Default Judgement**

Rule 55 of the Federal Rules of Civil Procedure establishes the two steps to obtain a default judgment. *See generally* Fed. R. Civ. P. 55. When "a party against whom . . . relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default." Fed. R. Civ. P. 55(a). "Thereafter, under Rule

55(b), should the party still fail to appear or move to set aside the default, the Court may enter a default judgement." *McDaniel v. Scotch & Soda Retail, LLC*, No. 23-CV-7859 (DLC) (RFT), 2024 WL 5456912 at *4 (S.D.N.Y. Nov. 22, 2024). When the amount sought is not certain, or cannot be made certain by computation, the party seeking relief must apply for a default judgment. *See* Fed. R. Civ. P. 55(b)(2). To enter or effectuate judgment, the court may conduct hearings or make referrals to (1) conduct an accounting, (2) determine the amount of damages, (3) establish the truth of any allegation, (4) investigate any other matter to enter or effectuate judgment. *See id*. "[T]he court may . . . enter a default judgment if liability is established as a matter of law when the factual allegations of the complaint are taken as true." *Bricklayers & Allied Craftworkers Loc. 2, Albany, N.Y. Pension Fund v. Moulton Masonry & Constr., LLC*, 779 F.3d 182, 187 (2d Cir. 2015). In accordance with the first step of the two-step process set forth in Rule 55, the Clerk of Court entered the Certificate of Default. (*See* ECF 33, Clerk's Cert. of Def.)

In considering whether to enter default judgment, courts are guided by the factors of (1) whether the default was willful; (2) whether ignoring the default would prejudice the opposing party; and (3) whether the defaulting party has presented a meritorious defense. *See Bricklayers,* 779 F.3d at 186*.* Courts must be cautious in awarding default judgment because it is an extreme remedy that should only be granted as a last resort. *See Meehan v. Snow*, 652 F.2d 274, 277 (2d Cir. 1981).

## II.    Determining Liability and Damages

"By failing to answer the Complaint, a defendant is deemed to have admitted the factual allegations in the Complaint." *Prepared Food Photos, Inc. v. Trip Rest. LLC*, No. 1:22-CV-07953-ER, 2023 WL 2955298, at *3 (S.D.N.Y. Apr. 14, 2023). However, the Court must then determine if

the allegations accepted as true establish liability for the defendants as a matter of law. *See Gesualdi v. Quadrozzi Equip. Leasing Corp.*, 629 F. App'x 111, 113 (2d Cir. 2015). On a motion for a default judgment, "the burden is on the plaintiff to establish an entitlement to recovery, and a failure to plead sufficient facts may require the denial of the motion." *Holguin v. Quality Furniture NY LLC*, No. 23-CV-0004 (AT) (RFT), 2024 WL 4954048 at *4 (S.D.N.Y. Nov. 8, 2024).

A valid claim for relief requires that the complaint "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Determining whether a complaint states a plausible claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

"Once liability has been established, a plaintiff must provide admissible evidence establishing the amount of damages with reasonable certainty." *Reisman v. Ne. Power & Gas LLC*, 720 F. Supp. 3d 279, 291 (S.D.N.Y. 2024). The district court is not obligated to accept plaintiff's statement of damages during the inquest because a defendant defaults. *See Ramgoolie v. Ramgoolie*, No. 22-1409, 2024 WL 4429420, at *4 (2d Cir. Oct. 7, 2024) (citing *Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp., Div. of Ace Young Inc.*, 109 F.3d 105, 111 (2d Cir. 1997)). The court must determine the appropriate damages based on the evidence because "[a] plaintiff's statement . . . of damages alone does not provide the requisite reasonable certainty." *RGI Brands LLC v. Cognac Brisset-Aurige, S.a.r.l.*, No. 12-CV-1369 (LGS) (AJP), 2013 WL 1668206, at *6 (S.D.N.Y. Apr. 18, 2013) (citing *House v. Kent Worldwide Mach.*

*Works, Inc.*, 359 F. App'x 206, 207 (2d Cir. 2010), *report and recommendation adopted*, 2013 WL 4505255 (S.D.N.Y. Aug. 23, 2013); *Agbaje v. Bah*, No. 09-CV-6201 (DLC) (RLE), 2010 WL 6370541, at *3 (S.D.N.Y. Dec. 23, 2010), *report and recommendation adopted*, 2011 WL 1197641 (S.D.N.Y. Mar. 25, 2011). If a plaintiff fails to demonstrate its damages with reasonable certainty, the court should decline to award damages despite a finding of liability through default. *See Lenard v. Design Studio*, 889 F. Supp. 2d 518, 527 (S.D.N.Y. 2012).

The Court proceeds without a hearing and determines that damages can be resolved on the submissions and prior proceedings. *See Bus. Casual Holdings, LLC v. TV-Novosti*, No. 21-CV-2007 (JGK) (RWL), 2023 WL 1809707, at *5 (S.D.N.Y. Feb. 8, 2023) (holding that no hearing on damages is necessary when no party requests one).

### **JURISDICTION AND VENUE**

Because the Plaintiff brought this action under Title VII, subject-matter jurisdiction for each Title VII claim is proper pursuant to 28 U.S.C. § 1331 (federal question jurisdiction). "Federal district courts have supplemental jurisdiction over non-federal law claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." *Henry v. NYC Health & Hosp. Corp.*, 18 F. Supp. 3d 396, 413 (S.D.N.Y. 2014) (quoting 28 U.S.C. § 1367(a)). The NYCHRL claims and the Title VII claims arise out of the same case or controversy, as they are based on the same instances of unlawful discrimination, retaliation, and sexual harassment. (*See* ECF 3, Compl. ¶ 10.) Therefore, the Court has supplemental jurisdiction over the NYCHRL claims pursuant to 28 U.S.C. § 1367. *See Williams v. Firequench, Inc.*, No. 21-CV-4112 (PAE) (JLC), 2022 WL 3571752 at *2 n.2 (S.D.N.Y. Aug. 19, 2022) (holding that "[t]he Court has jurisdiction over

this matter pursuant to 28 U.S.C. § 1331 given the Title VII claim, and supplemental jurisdiction over the NYSHRL and NYCHRL claims").

"A necessary prerequisite to entry of a default judgement" is whether the Court has personal jurisdiction over Defendant, Slutty Vegan. *Ventarola v. Narvaez*, No. 18-CV-3231 (PMH) (BCM), 2021 WL 1536540, at *4 (S.D.N.Y. Feb. 16, 2021), *report and recommendation adopted*, 2021 WL 839454 (S.D.N.Y. Mar. 5, 2021). The Court must assess "whether the defendant is subject to jurisdiction under the law of the forum state – here, New York" and then "consider whether the exercise of personal jurisdiction over the defendant comports with the Due Process Clause of the United States Constitution." *Reilly v. Com.*, No. 15-CV-5118 (PAE) (BCM), 2016 WL 6837895, at *2 (S.D.N.Y. Oct. 31, 2016), *report and recommendation adopted*, 2016 U.S. Dist. LEXIS 160884 (S.D.N.Y. Nov. 21, 2016).

Slutty Vegan is a nonresident of the State of New York. (*See* ECF 3, Compl. ¶ 15.) A court in New York may exercise personal jurisdiction over a non-domiciliary if the defendant transacts any business within the state and the cause of action arises from that business transaction. *See Romero v. 88 Acres Foods, Inc.*, 580 F. Supp. 3d 9, 15 (S.D.N.Y. 2022); N.Y. C.P.L.R. § 302(a)(1). A nonresident transacts business in New York when they purposefully avail themselves of the privilege of conducting activities within New York, thus invoking the benefits and protections of its law. *See id.* A cause of action arises from such business transaction when there is "an articulable nexus, or a substantial relationship, between the claim asserted and the actions that occurred in New York." *Henderson v. I.N.S.*, 157 F.3d 106, 123 (2d Cir. 1998). Here, at the time of the alleged discriminatory conduct, Slutty Vegan maintained two locations in New York City, one

13

in Harlem, and one on Bleeker Street in 2024. (*See* ECF 3, Compl. ¶ 3.)[15] The alleged

discriminatory conduct took place at Defendant's Bleeker Street location while Plaintiff was

employed there. (*See* ECF 3, Compl. ¶¶ 9-12.)[16] Accordingly, the Court has personal jurisdiction

over Defendant. *See Romero*, 580 F. Supp. 3d at 15-16 (finding specific personal jurisdiction over

a corporate defendant who "transact[ed] business in New York" and "ensure[d] the delivery in

New York" of products it sold).

"Before a federal court may exercise personal jurisdiction over a defendant, the

procedural requirement of service of summons must be satisfied." *Omni Cap. Int'l, Ltd. v. Rudolf*

*Wolff & Co.*, 484 U.S. 97, 104 (1987). "Where the defendant has defaulted, the plaintiff must

establish adequate service in order to obtain a default judgment." *Munson v. Diamond*, No. 15-

CV-00425 (DAB) (BCM), 2017 WL 4863096 at *2 (S.D.N.Y. Jun. 1, 2017). "Fed. R. Civ. P. 4(h)(1)(A)

and 4(e)(1) state that service may be made on a domestic or foreign corporation by following

state law in the state where the district court is located." *Id.* at *3. Personal service on an agent

authorized to receive such service on behalf of a limited liability company complies with the

procedural requirements for service of process under N.Y. C.P.L.R. 311-a. *See Fed. Nat'l Mortg.*

*Ass'n v. JDM Washington St. LLC*, No. 25-CV-1728 (LJL), 2025 WL 1114401, at *2 (S.D.N.Y. Apr. 15,

2025) (explaining that the plaintiff established the procedural requirements for service of

process pursuant to N.Y. C.P.L.R. 311-a where the plaintiff served the summons and verified

---

[15]    This citation references the second paragraph 3.

[16]    This citation references the second set of paragraphs 9-12. The Harlem and Bleeker
Street locations of Slutty Vegan have since closed, and the Brooklyn location remains open. (*See*
ECF 20, Aff. of Service No. 9.) The relevant time in determining jurisdiction is the time of the
conduct, not the time of service. *See Kronisch v. United States*, 150 F.3d 112, 130 (2d Cir. 1998).

complaint, as well as other relevant papers in this case, on the defendant by personally delivering them to the defendant's address to an employee authorized by appointment to receive service of process). "[P]ersonal service of process upon a corporation may be made by a non-party's delivery of the summons 'to an officer, director, managing or general agent, or cashier or assistant cashier or to any other agent authorized by appointment or by law to receive service.'" *Jordan-Rowell v. Fairway Supermarket*, No. 18-CV-01938 (VEC) (DF), 2019 WL 570709, at *5 (S.D.N.Y. Jan. 16, 2019) (quoting N.Y. C.P.L.R. 311).

Plaintiff has established that the procedural requirements for service of process have been satisfied. On April 11, 2025, Plaintiff filed an affirmation of service by its service provider that, on April 8, 2025, he served the summons and verified complaint on Defendant by personally delivering them to Defendant's authorized agent, Corporation Service Co. ("CSC"). (*See* ECF 11, 1st Affidavit of Service.) On May 1, 2025, I issued an order extending the deadline for Defendant to respond to the Complaint until May 16, 2025, and directed Plaintiff to serve by May 8, 2025, the summons, the Complaint, and a copy of the order by registered mail at Defendant's Delaware registered agent and to any places of business of Defendant that are known to Plaintiff, and by email addresses used by Defendant and known to Plaintiff. (*See* ECF 12, May 1st Order.) On May 8, 2025, Plaintiff filed fourteen Affidavits of Service by counsel that, on May 6, 2025, he served the summons, verified complaint, and the May 1 Order on Defendant corresponding to each of the twelve addresses to which Plaintiff mailed, via registered mail, and the two email addresses to which Plaintiff emailed. (*See* ECF 13-26, Affidavits of Service Nos. 2-15.)

Venue is proper in "a judicial district in which a substantial part of the events . . . giving rise to the claim occurred." 28 U.S.C. § 1391(b)(2). Here, the alleged discriminatory conduct took place at Defendant's Bleeker Street location, located at 280 Bleecker St, New York NY 10014, while Plaintiff was employed there. (*See* ECF 3, Compl. ¶¶ 1, 9-12.)[17] Accordingly, venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2).

### **LIABILITY**

In evaluating whether a complaint contains sufficient factual matter to state a claim to relief that is plausible on its face, the Court may consider the factual allegations of the complaint, as well as uncontroverted documentary evidence submitted with the motion for default judgement. *See Zaragoza v. Pappas OG LLC*, No. 24-CV-8644 (LGS), 2025 WL 3102357, at *2 (S.D.N.Y. Nov. 6, 2025). Additionally, in the context of a Title VII action, the Court may consider an EEOC discrimination charge referred to or attached to a complaint "in analyzing the sufficiency of the plaintiff's complaint." *Bromfield v. Bronx Lebanon Special Care Ctr., Inc.*, No. 16-CV-10047 (ALC) (SLC), 2022 WL 19406559, at *10 (S.D.N.Y. Dec. 8, 2022), *report and recommendation adopted*, 2023 WL 2706989 (S.D.N.Y. Mar. 30, 2023).

### I.    Plaintiff's Title VII Claim for Sex Discrimination

#### A.    Legal Principles

Title VII makes it unlawful for a covered employer to "discriminate against any individual with respect to . . . terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). A plaintiff must allege the

---

[17]    This citation references the second paragraph 1 and second paragraphs 9-12.

following elements in order to plead a successful Title VII discrimination claim: "(1) that she is a member of a protected class; (2) that she was qualified for employment in the position; (3) that she suffered an adverse employment action; and, in addition, has (4) some minimal evidence suggesting an inference that the employer acted with discriminatory motivation." *Littlejohn v. City of New York*, 795 F.3d 297, 307 (2d Cir. 2015). The plaintiff bears a de minimis burden. *See Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 203-4 (2d Cir. 1995).

Where a plaintiff seeks to hold an employer liable for the discriminatory conduct of another employee, the plaintiff must also allege a specific basis for imputing that conduct to the employer. *See Murdaugh v. City of New York*, No. 10-CV-7218 (HB), 2011 WL 4001011, at *1 (S.D.N.Y. Sept 1, 2011). To impute to an employer liability for the actions of an employee under Title VII, a plaintiff must show "that the employer either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it." *Reed v. A.W. Lawrence & Co., Inc.*, 95 F.3d 1170, 1180 (2d Cir. 1996).

### 1.    Administrative Exhaustion

Before filing a lawsuit alleging a Title VII violation, a plaintiff must file the claims with the EEOC or the relevant state of local agency, if any. *See Cardwell v. Davis Polk & Wardwell LLP*, No. 19-CV-10256 (GHW), 2020 WL 6274826, at *38 (S.D.N.Y. Oct. 24, 2020). A plaintiff may bring claims under Title VII only for issues raised in an administrative complaint or reasonably related to the issues raised in an administrative complaint. *See Gomez v. New York City Police Dep't,* 191 F. Supp. 3d 293, 299 (S.D.N.Y. 2016); *Dennis v. United Parcel Serv. Inc.,* No. 07-CV-9754 (HB), 2008 WL 4945634, at *4 (S.D.N.Y. Nov. 20, 2008). As relevant here, "Title VII requires a plaintiff to file a charge of discrimination with the EEOC within 300 days of the alleged act of

17

discrimination." *Yobo v. N.Y. State Facilities Dev. Corp.*, 13 F. App'x 41, 43 (2d Cir. 2001). Upon receipt of a right-to-sue letter from the EEOC, a plaintiff must then file an action in federal court within 90 days. *See Stapleton v. N.Y.C. Dep't of Educ.*, No. 22-CV-9351 (DEH) (SDA), 2024 WL 4451304, at *12 (S.D.N.Y. Apr. 18, 2024), *adopted by* 2024 WL 4182602 (S.D.N.Y. Sept. 13, 2024).

### 2.    Qualified for Employment

To meet the minimal inference of qualification required of him at the pleading stage, a plaintiff "need only . . . [allege] that [ ]he possesses the basic skills necessary for performance of the job." *Gregory v. Daly*, 243 F.3d 687, 696 (2d Cir. 2001). When an employer "has already hired the employee into the job in question . . . the employer itself has already expressed a belief that [ ]he is minimally qualified." *Id.* There is no need for the plaintiff to allege that "[ ]he was a perfect or even an average employee." *Briggs v. Women in Need, Inc.*, 819 F. Supp. 2d 119, 127 (E.D.N.Y. 2011) (citing *Powell v. Syracuse Univ.*, 580 F.2d 1150, 1155 (2d Cir. 1978)).

### 3.    Adverse Employment Action

To constitute an adverse employment action in the context of a discrimination claim, an action must cause "a materially adverse change in the terms and conditions of employment." *Mathirampuzha v. Potter*, 548 F.3d 70, 78 (2d Cir. 2008). The change in working conditions "must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Id.* "Examples of such a change include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." *Id.*

In April 2024, the Supreme Court clarified that, in the context of a claim of discriminatory transfer, "a [plaintiff] must show some harm respecting an identifiable term or

condition of employment." *Muldrow v. City of St. Louis*, 601 U.S. 346, 347 (2024). The Court held that the harm did not need to be "significant," "serious, or substantial, or any similar adjective suggesting that the disadvantage to the employee must exceed a heightened bar." *Id.* at 355; *see also Back v. Hapoalim*, No. 24-1064, 2024 WL 4746263, at *2 (2d Cir. Nov. 12, 2024). The Supreme Court explained that it was sufficient that an adverse employment action created "some disadvantageous change in an employment term or condition." *Muldrow*, 601 U.S. at 354. However, criticism, excessive scrutiny, and inappropriate comments are not, standing alone, adverse employment actions under the ADA. *See, e.g., Royall v. City of Beacon*, No. 24-CV-0003 (KMK), 2024 WL 4266546, at *14 (S.D.N.Y. Sept. 23, 2024) (explaining that one-off stand-alone inappropriate comments "do not constitute adverse employment action").

### 4. Discriminatory Intent

"The law in this Circuit is clear that the *sine qua non* of a Title VII discrimination claim is that the discrimination must be because of a protected characteristic." *Henry v. NYC Health & Hosp. Corp.*, 18 F. Supp. 3d 396, 407 (S.D.N.Y. 2014) (quoting *Patane v. Clark*, 508 F.3d 106, 112 (2d Cir. 2007)). Discriminatory intent can be supported "either by pleading direct evidence of discrimination, including comments indicating prejudice on account of a protected characteristic, or by pleading facts showing that comparators outside the Plaintiff's group were treated better than Plaintiff." *Mitura v. Finco Servs., Inc.*, 712 F. Supp. 3d 442, 453 (S.D.N.Y. 2024). "At the pleadings stage, then, a plaintiff must allege that the employer took adverse action against [him] at least in part for a discriminatory reason, and [ ]he may do so by alleging facts that directly show discrimination or facts that indirectly show discrimination by giving rise

to a plausible inference of discrimination." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 87 (2d Cir. 2015).

      B.      <u>Analysis of Plaintiff's Title VII Sex Discrimination Claim</u>

Plaintiff appears to have administratively exhausted his claim for sex discrimination. The alleged discriminatory acts took place from March 8, 2024, to April 19, 2024. (*See* ECF 3, Compl. ¶ 2.) On October 31, 2024, Plaintiff filed a charge of unlawful discrimination, retaliation, and sexual harassment with the EEOC. (ECF 3, Compl. ¶ 10.) The EEOC found that Defendant had "engaged in employment discrimination in violation of the Title VII" and issued a Right To Sue Notice dated January 2, 2025. (ECF 3-1, Right To Sue Notice at 2.) Plaintiff filed this action on April 2, 2025. (*See* ECF 3, Compl.) Accordingly, the EEOC complaint and this action were both filed within the relevant statutory periods.

Plaintiff was employed by Defendant from March 8, 2024, to April 19, 2024. (*See* ECF 3, Compl. ¶ 2.) Therefore, Plaintiff was minimally qualified for the job. *See Gregory*, 243 F.3d at 696 (holding that when an employer has already hired the employee into the job in question, the employer itself has already expressed a belief that he is minimally qualified).

Plaintiff has adequately alleged that he suffered adverse employment actions. Plaintiff was terminated from his employment with the Defendant. Termination of employment constitutes a materially adverse change in the terms and conditions of employment. *See Henry*, 18 F. Supp. 3d at 404 (explaining that examples of an adverse employment action "include termination of employment"). Moreover, Plaintiff alleges numerous incidents of unwanted sexual touching by a co-worker, which created a hostile work environment in violation of Title VII. (*See* ECF 3, Compl. ¶¶ 1-2.) "Even a single incident of sexual assault" – including unwanted

sexual touching – "sufficiently alters the conditions of the victim's employment and clearly creates an abusive work environment under Title VII." *Motz v. Chartwell Resorts*, No. 04-CV-3983 (GAY), 2006 WL 1140707, at *1 (S.D.N.Y. Apr. 27, 2006). Plaintiff has adequately alleged that he suffered adverse employment actions.

Plaintiff has also adequately alleged that discrimination Plaintiff suffered was due to a protected characteristic: his sex.[18] Plaintiff alleges that he was subjected to unwanted sexual touching and/or harassed by a co-worker "every single day." (ECF 3, Compl. ¶ 3.) "Sexual harassment is a form of sex discrimination." *Stein v. Town of Greenburgh*, No. 21-CV-05673 (PMH), 2025 WL 903758, at *13 (S.D.N.Y. Mar. 25, 2025). Therefore, Plaintiff has sufficiently alleged that his co-worker has discriminated against him on the basis of sex.

Plaintiff has also adequately alleged that liability for the discriminatory actions of Plaintiff's former co-worker may be imputed to Defendant. Plaintiff alleged that he reported the discriminatory behavior of his co-worker to Defendant's team leaders and managers on every single shift he worked. (*See* ECF 3, Compl. ¶ 4.) Plaintiff further alleged that on each of these occasions, shift managers laughed. (*See id.*) Therefore, Plaintiff has adequately alleged that he suffered sex discrimination for which Defendant may be held liable. *See Reed*, 95 F.3d at 1181 (holding that where an employer, in response to inappropriate conduct by an employee, terminated the employee who complained about it is sufficient such that a jury could impute a

---

[18]     Sex has been defined as "the sum of the peculiarities of structure and function that distinguish a male from a female organism." *Black's Law* Dictionary (12th ed. 2024). Sexual harassment includes "verbal or physical maltreatment, pestering, or abuse of a sexual nature." *Id*. In *Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 683 (2020), the Supreme Court held that discrimination against an individual on the basis of transgender identity constitutes discrimination based on sex.

co-worker's conduct on their employer); *see also Hill v. Children's Village*, 196 F. Supp. 2d 389, 398-99, 401 (S.D.N.Y. 2002) (finding that management's failure to report harassment and human resources' obstruction of the reporting process could lead a jury to find that the employer failed to provide a "reasonable avenue for complaint"); *DeCurtis v. Upward Bound Intern., Inc.*, No. 09-CV-5378 (RJS), 2011 WL 4549412, at *1, 5 (S.D.N.Y. Sept. 27, 2011) (imputing liability to an employer upon default judgment where the owner was aware of repeated harassment but failed to take action in response to the plaintiff's complaints, instead advising the plaintiff not to let the harasser upset her).

## II. Plaintiff's Retaliation in Violation of Title VII Claim

### A. Legal Principles

Title VII makes it unlawful for an employer to discriminate against an employee because he opposed an unlawful employment practice, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under Title VII. *See* 42 U.S.C. § 2000e-3(a). "To establish a presumption of retaliation at the initial stage of a Title VII litigation, a plaintiff must present evidence that shows (1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Littlejohn*, 795 F.3d at 315-16. The allegations in the complaint need only give plausible support to the prima facie requirements in the initial phase of a Title VII litigation. *See id.*

#### 1. Protected Activity

For the purposes of determining whether an activity is protected, it is unlawful for an employer to retaliate against an individual because he opposed any practice made unlawful by

22

Title VII, or because he "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under Title VII." *Id.* at 316.

### 2.    Knowledge of Plaintiff's Protected Activity

A plaintiff must "ordinarily plead that the defendant had knowledge of the protected activity." *Cardwell*, , 2020 WL 6274826, at \*31. A plaintiff may meet this pleading standard by alleging facts that permit the court to "reasonably infer that [he] engaged in protected activity known to the Defendants." *Id.* For instance, an employer is deemed aware of a protected activity when an employee complains to supervisory personnel or officers of the company regarding the alleged unlawful conduct. *See Reed*, 95 F.3d at 1178.

### 3.    Adverse Employment Action

"To establish that a retaliatory adverse employment action occurred, the same analysis as employed in the discrimination context applies." *Nidzon v. Konica Minolta Bus. Sol., USA, Inc.*, 752 F. Supp. 2d 336, 353 (S.D.N.Y. 2010). An adverse employment action must cause "a materially adverse change in the terms and conditions of employment." *Mathirampuzha*, 548 F.3d at 78. In the context of a claim of discriminatory transfer, "a [plaintiff] must show some harm respecting an identifiable term or condition of employment," but the harm does not need to be "significant," "serious, or substantial." *Muldrow,* 601 U.S. at 354-55. *See also supra* Part I.A.3.

### 4.    Causation

"Once an adverse employment action has been sufficiently alleged, Plaintiff must successfully establish a causal connection between the protected activity and the adverse employment action." *Nidzon*, 752 F. Supp. 2d at 353. A plaintiff may demonstrate this causal

connection either "(1) indirectly, by showing that the protected activity was followed closely by

discriminatory treatment, or through other circumstantial evidence such as disparate treatment

of fellow employees who engaged in similar conduct; or (2) directly, through evidence of

retaliatory animus directed against the plaintiff by the defendant." *Littlejohn*, 795 F.3d at

319 (quoting *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000)).

"Close temporal proximity between the plaintiff's protected action and the employer's

adverse employment action may in itself be sufficient to establish the requisite causal

connection between a protected activity and retaliatory action." *Kaytor v. Elec. Boat Corp.*, 609

F.3d 537, 552 (2d Cir. 2010). "[D]istrict courts within the Second Circuit have consistently held

that the passage of more than two to three months between the protected activity and the

adverse employment action militates against an inference of causation." *Kim v. Goldberg,*

*Weprin, Finkel Goldstein, LLP*, 862 F. Supp. 2d 311, 319 (S.D.N.Y. 2012) (ruling that a four-month

gap "preclude[d] the Court from presuming that there was a causal connection based on

temporal proximity alone); *see also Schiraldi v. ProHEALTH Med. Mgmt., LLC*, No. 21-CV-5956

(OEM) (ST), 2024 WL 4252051, at *19 (E.D.N.Y. Sept. 20, 2024) (citing cases).

B.    <u>Analysis of Plaintiff's Claims of Retaliation Under Title VII</u>

Plaintiff adequately alleges that he engaged in protected activity by lodging complaints

with her supervisor as well as objecting to her co-worker's discriminatory conduct. (*See* ECF 3,

Compl. ¶¶ 3-4, 6.) Such internal complaints to management regarding sexual harassment and

sex discrimination constitute protected activity under Title VII. *See Reed*, 95 F.3d at 1178.

Furthermore, these internal complaints to management regarding sexual harassment and sex

discrimination made Defendant aware of the protected activity. *See id.* Accordingly, Plaintiff has adequately alleged that he engaged in protected activity and that Defendant was aware of it.

Plaintiff has adequately alleged that he suffered adverse employment actions. *See supra* Part I.B.

Plaintiff has also sufficiently shown a causal connection between his protected activity and Defendant's adverse actions against him, as required to state a claim for retaliation under Title VII. *See Nidzon*, 752 F. Supp. 2d at 353. Plaintiff filed his first formal complaint with the general manager in early April after a particularly demoralizing assault. (*See* ECF 3, Compl. ¶¶ 18-21.) Two days later Plaintiff was taken off the schedule and suspended from working until Defendant could conduct a formal investigation. (*See id.* ¶¶ 23-24.) He was terminated on April 19, 2024, two weeks later, while his complaints to management were under review, purportedly for reacting too aggressively to his co-worker's unwanted touching. (*See id*. ¶ 2.) The close temporal proximity between Plaintiff's formal complaint and his termination is sufficient to establish the requisite causal connection. *See Kaytor*, 609 F.3d at 552; *Reed*, 95 F.3d at 1178 (finding that a period of twelve days between the plaintiff's initial complaint and her discharge was sufficient to establish a causal connection through temporal proximity); *Erasmus v. Deutsche Bank Americas Holding Corp.*, No. 15-CV-1398 (PAE), 2015 WL 7736554, at *12 (S.D.N.Y. Nov. 30, 2015) (finding that approximately two weeks between an EEOC mediation and an adverse employment action, and just over one month between the mediation and termination, were each sufficient to support a causal inference of retaliation).

Accordingly, Plaintiff has stated a claim for retaliation under Title VII.

**III.    Plaintiff's Gender Discrimination in Violation of NYCHRL § 8-107(1) Claim**

A.    Legal Principles

Courts must analyze NYCHRL claims "separately and independently from any federal and state law claims," construing the NYCHRL's provisions "broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013). The NYCHRL "does not distinguish between discrimination and hostile work environment claims; rather, both are governed by N.Y.C. Admin. Code § 8–107(1)(a)." *Hornig v. Trustees of Columbia Univ. in the City of New York*, No. 17-CV-3602 (ER), 2022 WL 976267, at *19 (S.D.N.Y. Mar. 31, 2022).

Section 8-107(1)(a) of the NYCHRL makes it an unlawful discriminatory practice for an employer, "because of the . . . gender . . . of any person, to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment." N.Y.C. Admin. Code § 8-107(1)(a). Unlike Title VII, the NYCHRL "does not require either materially adverse employment actions or severe and pervasive conduct." *Mihalik*, 715 F.3d at 114. Rather, to establish a gender discrimination claim under the NYCHRL, a plaintiff "need only demonstrate by a preponderance of the evidence that she has been treated less well than other employees because of her gender." *Id.* at 110. "Under this standard, the conduct's severity and pervasiveness are relevant only to the issue of damages." *Id.* A showing that the plaintiff was "treated less well because of a discriminatory intent would suffice." *Villalta v. JS Barkats, P.L.L.C.*, No. 16-CV-2772 (RA) (RWL), 2021 WL 2458699, at *10 (S.D.N.Y. Apr. 16, 2021), *report and recommendation adopted*, 2021 WL 2458023 (S.D.N.Y. June 16, 2021).

In evaluating a plaintiff's claim, courts must consider the "totality of the circumstances" because "the overall context in which the challenged conduct occurs cannot be ignored." *Mihalik*, 715 F.3d at 113. Although the NYCHRL is not a "general civility code," and a defendant is not liable if the conduct consists of nothing more than "petty slights or trivial inconveniences," the employer bears the burden of proving such triviality as an affirmative defense. *Id.*

Where, as here, a plaintiff seeks to hold an employer liable for the discriminatory conduct of a supervisory employee, the NYCHRL imposes strict liability. An employer is liable under the NYCHRL where "the employee or agent exercised managerial or supervisory responsibility." N.Y.C. Admin. Code § 8-107(13)(b)(1); *see also Hornig*, 2022 WL 976267, at *15 ("The NYCHRL imposes strict liability on employers for discriminatory acts of managerial employees.").

B.    <u>Analysis of Plaintiff's NYCHRL Gender Discrimination Claim</u>

Plaintiff has adequately alleged that he was "treated less well" because of his gender. *Mihalik*, 715 F.3d at 110. As set forth in the Title VII analysis above, Plaintiff alleges that he was subjected to sexual assault and harassment by a co-worker on every one of his 42 days of employment, often ten to fifteen times per shift. (*See* ECF 3, Compl. ¶¶ 3, 7.) Sexual harassment constitutes gender discrimination under the NYCHRL, and the standard for establishing such a claim is more liberal than under Title VII; the plaintiff need not prove that the conduct was severe or pervasive. *See Mihalik*, 715 F.3d at 114. Because Plaintiff has adequately alleged unwanted gender-based conduct, he has satisfied the NYCHRL's "treated less well" standard. *See Villalta*, 2021 WL 2458699, at *10 (finding plaintiff established a prima facie case of NYCHRL

gender discrimination where her continued employment was conditioned upon acquiescing to sexual assault, as she was "treated less well than her male counterparts").

Defendant's conduct cannot be characterized as "petty slights or trivial inconveniences." *Mihalik*, 715 F.3d at 111. Plaintiff alleges hundreds of instances of sexual assault and harassment over the course of his employment, culminating in his termination after reporting the conduct to management. (*See* ECF 3, Compl. ¶¶ 3-4, 7.) Such conduct far exceeds what courts in this Circuit have deemed trivial. *See Garcia v. Comprehensive Ctr., LLC*, No. 17-CV-8970 (JPO) (BCM), 2019 WL 8274296, at *4 (S.D.N.Y. Nov. 21, 2019) (finding gender discrimination claim under NYCHRL established on default where plaintiff suffered physical violence, racial and sexual harassment, and constructive termination), *report and recommendation adopted*, 2020 WL 1435002 (S.D.N.Y. Mar. 24, 2020).

Liability for the discriminatory conduct of Plaintiff's co-worker may be imputed to Defendant under the NYCHRL. Plaintiff alleged that he reported the discriminatory behavior to Defendant's team leaders and managers on every single shift, and that on each occasion, shift managers laughed at his complaints. (*See* ECF 3, Compl. ¶ 4.) Under the NYCHRL, an employer is strictly liable where it knew of an employee's discriminatory conduct and acquiesced in such conduct or failed to take immediate and appropriate corrective action. *See* N.Y.C. Admin. Code § 8-107(13)(b)(2); *see DeCurtis*, 2011 WL 4549412, at *5 (imputing liability to employer upon default judgment where owner was aware of repeated harassment but failed to act).

Accordingly, because Plaintiff has established his Title VII gender discrimination claim, and because the NYCHRL standard is more liberal than that of Title VII, Plaintiff has necessarily also established his NYCHRL gender discrimination claim. *See McDaniel*, 2024 WL 5456912, at

*16 ("Having demonstrated that [defendant] retaliated against her in violation of Title VII, [the plaintiff] has also met the more lenient requirements of the NYCHRL.").

IV.     **Plaintiff's Retaliation in Violation of NYCHRL § 8-107(7) Claim**

A.          <u>Legal Principles</u>

As with discrimination claims, courts must analyze NYCHRL retaliation claims "separately and independently from any federal and state law claims." *Mihalik*, 715 F.3d at 109. Section 8-107(7) of the NYCHRL prohibits employers from "retaliat[ing] or discriminat[ing] in any manner against any person because such person has . . . opposed any practice forbidden under this chapter." N.Y.C. Admin. Code § 8-107(7). To prevail on a retaliation claim under the NYCHRL, a plaintiff must show that (1) she took an action opposing her employer's discrimination; (2) her employer was aware that she had participated in such activity; (3) her employer engaged in conduct which was reasonably likely to deter a person from engaging in that protected activity; and (4) there is a causal connection between the protected activity and the alleged retaliatory conduct. *See Mihalik*, 715 F.3d at 112; *see also Villalta*, 2021 WL 2458699, at *10.

1.          Protected Activity

Under the NYCHRL, protected activity is defined broadly. A plaintiff engages in protected activity by "oppos[ing] any practice forbidden under this chapter." N.Y.C. Admin. Code § 8-107(7). The New York Court of Appeals has held that "oppos[ing] any practice" can include situations where a person "made clear her disapproval of [the defendant's] discrimination by communicating to [him], in substance, that she thought [his] treatment of [the victim] was wrong." *Mihalik*, 715 F.3d at 112 (quoting *Albunio v. City of New York*, 16 N.Y.3d 472, 479 (N.Y. Ct. App. 2011)). This standard is broader than its Title VII counterpart, as New York courts have

29

"broadly interpreted the NYCHRL's retaliation provisions." *Id.* Internal complaints to

management regarding discriminatory conduct constitute protected activity under the NYCHRL.

*See McDaniel*, 2024 WL 5456912, at *9.

### 2.    Employer's Awareness of Protected Activity

As under Title VII, a plaintiff must allege that the employer was aware of the protected

activity. *See Reed*, 95 F.3d at 1178. An employer is deemed aware of a protected activity when

an employee complains to supervisory personnel or officers of the company regarding alleged

unlawful conduct. *See id.* Under the NYCHRL, an employer is deemed to have knowledge of an

employee's discriminatory conduct "where that conduct was known by another employee or

agent who exercised managerial or supervisory responsibility." N.Y.C. Admin. Code § 8-

107(13)(b)(2); *see also Erasmus*, 2015 WL 7736554, at *9.

### 3.    Conduct Reasonably Likely to Deter Protected Activity

A retaliation claim under the NYCHRL "need not result in an ultimate action with respect

to employment . . . or in a materially adverse change in the terms and conditions of

employment," provided that "the retaliatory or discriminatory act or acts complained of [are]

reasonably likely to deter a person from engaging in protected activity." N.Y.C. Admin. Code § 8-

107(7); *Mihalik*, 715 F.3d at 112. In assessing whether the employer's conduct was reasonably

likely to deter a person from engaging in protected activity, courts are to apply "a keen sense of

workplace realities" and recognize that "the chilling effect of particular conduct is context-

dependent." *Mihalik*, 715 F.3d at 112. Courts in this circuit have further noted that "a jury is

generally best suited to evaluate the impact of retaliatory conduct" under this standard. *Id*.

Where a supervisory employee engages in retaliatory conduct, that conduct is imputed to the

employer under the strict liability provision of N.Y.C. Admin. Code § 8-107(13)(b)(1). *See Villalta*, 2021 WL 2458699, at *9; *DeCurtis*, 2011 WL 4549412, at *5.

        4.       Causal Connection

The NYCHRL's causation standard is more lenient than that of Title VII. *McDaniel*, 2024 WL 5456912, at *9. A plaintiff need only show that retaliation "played any part" in the employer's decision. *See Mihalik*, 715 F.3d at 116. As under Title VII, a plaintiff may demonstrate causation either directly, through evidence of retaliatory animus, or indirectly, through temporal proximity or other circumstantial evidence. *See Hicks v. Baines*, 593 F.3d 159, 170 (2d Cir. 2010). Close temporal proximity between the protected activity and the retaliatory conduct is sufficient to establish the requisite causal connection under the NYCHRL. *See Kaytor*, 609 F.3d at 552.

        B.       <u>Analysis of Plaintiff's NYCHRL Retaliation Claim</u>

Applying the more liberal NYCHRL standard, Plaintiff has adequately stated a claim for retaliation under § 8-107(7). Because the NYCHRL retaliation standard is less demanding than that of Title VII, Plaintiff's established Title VII retaliation claim necessarily satisfies the NYCHRL as well. *See McDaniel*, 2024 WL 5456912, at *16 (holding that having demonstrated retaliation under Title VII, plaintiff "has also met the more lenient requirements of the NYCHRL").

As established in the Title VII retaliation analysis above, Plaintiff engaged in protected activity by lodging complaints with Defendant's team leaders and managers on every single shift he worked. (*See* ECF 3, Compl. ¶¶ 3–4.) Defendant was aware of this protected activity, as Plaintiff complained directly to shift managers on each occasion. (*See id.*) These internal complaints constitute protected activity under the NYCHRL. *See Mihalik*, 715 F.3d at 112

(holding that "oppos[ing] any practice" under the NYCHRL can include communicating disapproval of discrimination to a supervisor).

Plaintiff has also adequately alleged conduct reasonably likely to deter a person from engaging in protected activity. Unlike under Title VII, the NYCHRL does not require a materially adverse employment action; it is sufficient that the employer's conduct would reasonably deter future complaints. N.Y.C. Admin. Code § 8-107(7). Here, Defendant's shift managers laughed at Plaintiff's complaints of sexual assault occurring ten to fifteen times per shift on every occasion Plaintiff reported. (ECF 3, Compl. ¶ 4.) A reasonable employee subjected to such a response would be deterred from continuing to lodge complaints. *See Mihalik*, 715 F.3d at 112 (noting that assessment of deterrence "should be made with a keen sense of workplace realities"). Moreover, Plaintiff was ultimately terminated, which constitutes the paradigmatic retaliatory adverse action. *See DeCurtis*, 2011 WL 4549412, at *5.

Finally, the causal connection between Plaintiff's protected activity and Defendant's adverse actions is established for the same reasons set forth in the Title VII retaliation analysis above, *see supra* Part II.B, and is further supported by the NYCHRL's more lenient causation standard. *See Mihalik*, 715 F.3d at 116. The managers' repeated dismissal of Plaintiff's complaints, followed by his termination, is more than sufficient to satisfy this standard.

Defendant's retaliatory conduct is imputable to Defendant under the NYCHRL's strict liability provision, as Defendant's shift managers exercised supervisory responsibility over Plaintiff. N.Y.C. Admin. Code § 8-107(13)(b)(1); *see DeCurtis*, 2011 WL 4549412, at *5 (imputing liability to employer under NYCHRL where supervisory employees were aware of harassment and failed to intervene).

Accordingly, Plaintiff has adequately established a claim for retaliation under NYCHRL § 8-107(7).

**DAMAGES**

Following a default, the Court must ascertain damages with reasonable certainty. *See Ramgoolie*, 2024 WL 4429420, at *3. "Violations of Title VII and NYCHRL entitle a plaintiff to compensatory damages for pecuniary loss as well as pain and suffering." *DeCurtis*, 2011 WL 4549412, at *3. "Title VII places a sliding cap on non-economic compensatory and punitive damages based on employer size, with the lowest damages amount capped at $50,000 for employers of between fifteen and 100 employees, ranging upwards to $300,000 for employers with 500 or more employees." *Villalta,* 2021 WL 2458699, at *11. "While Title VII limits the amount of damages that can be awarded, the NYCHRL does not; as a result, courts allocate damages exceeding Title VII's cap to the NYCHRL when pleaded simultaneously." *Id.*

## I.    Plaintiff's Requested Back Pay

A back pay award is intended "to restore the employee to the status quo he would have enjoyed if the discriminatory discharge had not taken place." *Kirsch v. Fleet St., Ltd.*, 148 F.3d 149, 166 (2d Cir. 1998). "The choice of whether to award backpay is left to the equitable discretion of the district court." *Gilbert v. Hotline Delivery*, No. 00-CV-0160 (MBM) (RLE), 2001 WL 799576, at *2 (S.D.N.Y. Jul. 10, 2001) (citing *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 415-16 (1975)). In Title VII litigation, once unlawful employment practices are established, employees victimized by the discrimination "become presumptively entitled to backpay." *Cohen v. West Haven Bd. of Police Com'rs*, 638 F.2d 496, 502 (2d Cir. 1980). "Once a plaintiff has been

deemed eligible for the remedy, the method of assessing back pay is also a matter for the court's discretion." *Gilbert*, 2001 WL 799576, at *2.

A back pay award should reflect a reasonable calculation of what the plaintiff would have earned had he not faced any discrimination. *See Greenbaum v. Handelsbanken*, 67 F. Supp. 2d 228, 270 (S.D.N.Y. 1999). Back pay should be calculated from the date of discharge to the date on which a plaintiff obtains similar paid employment elsewhere. *See Villalta*, 2021 WL 2458699, at *12. "An employee discharged in violation of Title VII has an obligation to attempt to mitigate h[is] damages by using reasonable diligence in finding other suitable employment." *Hawkins v. 1115 Legal Serv. Care*, 163 F.3d 684, 695 (2d Cir. 1998). The burden to show lack of mitigation falls on defendants, and by failing to respond to a plaintiff's damages submission, a default defendant fails to assert an affirmative defense of failure to mitigate. *See Angulo v. 36th St. Hosp. LLC*, No. 19-CV-5075 (GBD) (SLC), 2020 WL 4938188, at *10 (S.D.N.Y. Jul. 31, 2020). A plaintiff need not accept employment that is not comparable to his previous position; but if he accepts less prestigious work, his earnings from that job are subtracted from his back pay award. *See Arbercheski v. Oracle Corp.*, 650 F. Supp. 2d 309, 312 (S.D.N.Y. 2009).

Defendant employed Plaintiff from March 8, 2024, to April 19, 2024. (ECF 3, Complaint at 2.) Plaintiff's total earnings for that 33-day period were $2,284.00, or $69.21 per day. (*See* ECF 51-16, Plaintiff's 2024 W-2 ("2024 W2") at 1.) Plaintiff's first employment following his termination by Defendant began on January 24, 2025, or 280 days after his final day of employment with Defendant. (*See* ECF 51, Mot. for Default at 23.) Plaintiff states that he was unemployed for 280 days because he is "primarily qualified to work in the service industry," but avoided service industry work due to the trauma Defendant inflicted. (*See* ECF 3, Compl. ¶ 31.)

Despite this, Plaintiff alleges that he persistently sought out other work following his termination. (*See id.* ¶ 30.) Accordingly, Plaintiff is entitled to backpay for the period between April 19, 2024, and January 24, 2025, as there is no evidence that the Plaintiff has failed to mitigate his damages. *See Angulo*, 2020 WL 4938188, at *10 (awarding backpay where defaulting defendants failed to put forth an affirmative defense of failure to mitigate); *Press v. Concord Mortg. Corp.*, No. 08-CV-9497 (KTD), 2010 WL 3199684, at *2 (S.D.N.Y. Aug. 11, 2010) (awarding back pay where defaulting defendants failed to meet their burden of showing plaintiff's "efforts to seek employment have been insufficient as an attempt to mitigate his damages"). Therefore, the reasonable amount of backpay Plaintiff is owed is $19,378.80.

## II.    Plaintiff's Requested Emotional Distress Damages

"Title VII, NYSHRL, and NYCHRL all allow for recovery of emotional distress damages." *Williams*, 2022 WL 3571752 at *7. "Courts in this Circuit frequently group emotional distress damages into three categories: garden-variety, significant, and egregious." *Qorrolli v. Metro. Dental Assoc., D.D.S. – 225 Broadway, P.C.*, No. 18-CV-6836 (DLC), 2022 WL 17689836, at *9 (S.D.N.Y. Dec. 15, 2022).

"In garden variety cases, the evidence of mental suffering is generally limited to the testimony of the plaintiff, who describes his or her injury in vague or conclusory terms, without relating either the severity or the consequences of the injury." *Id.* "Garden variety emotional distress claims generally merit $30,000.00 to $125,000.00 awards." *United States v. Asare*, 476 F. Supp. 3d 20, 37 (S.D.N.Y. 2020).

A plaintiff's claims of depression, anxiety, and sleeping issues caused by alleged employment discrimination are sufficient to claim garden variety emotional distress damages.

35

*See Williams*, 2022 WL 3571752 at *8. Courts in the Second Circuit commonly award compensatory damages in the range of $30,000 for claims of garden variety emotional distress caused by employment discrimination. *See id*.; *McDaniel*, 2024 WL 5456912 at *17, *report and recommendation adopted*, 2025 WL 401108 (S.D.N.Y. Feb. 4, 2025). However, Courts in the Second Circuit will award amounts in the $100,000 range in instances of sexual touching, or where discriminatory acts occurred over a period of more than a year. *See DeCurtis*2011 WL 4549412 at *4-5.

For example, in *DeCurtis*, the plaintiff was sexually harassed and repeatedly touched in a sexual manner without consent by her supervisor over the course of two years, and was later terminated, which caused constant stress, nervousness, and difficulty sleeping. *See* 2011 WL 4549412 at *1-2. The Court awarded the plaintiff $100,000 in compensatory damages for garden variety emotional distress. *See id*. at *5. And in *MacCluskey v. University of Connecticut Health Center*, the plaintiff, a dental assistant, experienced unwanted sexual comments and sexual touching for just over two years by her co-worker, a dentist, and testified that she felt "ashamed and embarrassed, was afraid to be home alone, afraid to go out in public, and didn't sleep for weeks." No. 13-CV-1408 (MPS), 2017 WL 684440, at *3-5, *15 (D. Conn. Feb. 21, 2017). On remittitur, the court reduced her award for garden variety emotional distress from $200,000 to $125,000. *Id*. at *16; *see also Manswell v. Heavenly Miracle Acad. Servs., Inc.*, No. 14-CV-7114 (MKB) (SMG), 2017 WL 9487194, at *18 (E.D.N.Y. Aug. 23, 2017) (awarding $75,0000 on a default judgment for garden variety emotional distress arising out of inappropriate sexual comments and demands by the defendant that the plaintiff engage in sex with him over an 18-month period), *report and recommendation adopted*, 2017 WL 4075180 (E.D.N.Y. Sept. 14,

36

2017); *Bouveng v. NYG Cap. LLC,* 175 F. Supp. 3d 280, 334 (S.D.N.Y. 2016) (reducing on remittitur to $150,000 an award for garden variety emotional distress caused by years of unwanted sexual touching, some coerced intercourse, and retaliation by the defendant by sending defamatory emails to the plaintiff's friends and family).

Plaintiff argues that he is entitled to $150,000 for garden variety emotional distress for his suffering over the 42 days of his employment. (*See* ECF 51, Mot. for Default at 26.) He avers that Defendant's alleged discrimination and retaliatory termination of Plaintiff exacerbated his depression, anxiety, post-traumatic stress disorder, and gender dysphoria. (*See* ECF 3, Compl. ¶ 2.) He contends that his depression "became so overwhelming that it affected his relationship with his partner and his other personal relationships." (*Id*. ¶ 28.) Plaintiff alleges that on every one of the 42 days of employment, his co-worker sexually harassed and/or touched Plaintiff in a sexual manner without consent, often ten to fifteen times per shift. (*See* ECF 3, Compl. ¶ 7.)[19] The conduct is analogous to the conduct in *DeCurtis*, where the award was $100,000 for harm due to sexual harassment over a two-year period, and to the conduct in *MacCluskey,* where the award was $125,000 for harm caused by sexual harassment during a period slightly over two years. Using *DeCurtis and MacCluskey* as benchmarks, and taking into account the shorter duration of Plaintiff's employment, I conclude that Plaintiff is entitled to an award of $80,000 in compensatory damages.

---

[19]    This citation refers to the second paragraph 7.

### III.    Plaintiff's Requested Punitive Damages

"Punitive damages are available under Title VII and NYCHRL." *DeCurtis*, 2011 WL 4549412 at *5. "Specifically, punitive damages may be awarded for a civil rights claim against a defendant employer under either Title VII or the NYCHRL if the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Id.* "The requisite state of mind may be inferred from the circumstances." *Id.* "Egregious or outrageous acts may serve as evidence supporting an inference of the requisite evil motive." *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 538 (1999). Factors to consider when assessing the reasonableness of punitive damages include (1) the degree of reprehensibility of the defendant's conduct; (2) the difference between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded and the civil penalties imposed in comparable cases. *See BMW of North America, Inc. v. Gore*, 517 U.S. 559, 574-5 (1996).

Egregious or outrageous acts warranting punitive damages often involve violent or coercive sexual contact, the intentional exploitation of an employee's mental or physical vulnerability, and malicious post-harassment conduct such as threats of physical violence or professional retaliation. *See Villalta*, 2021 WL 1458699, at *15, *18 (finding conduct "violent, willful, malicious, and intentional" where the defendant twice sexually assaulted the plaintiff, choked her, threatened to kill her, and later attempted to suborn perjury while threatening to disseminate revenge porn); *Munson*, 2017 WL 486096, at *9 (noting that "direct contact with an intimate body part" and repeated sexual propositions constituted sufficiently outrageous conduct to support an inference of evil motive); *DeCurtis*, 2011 WL 4549412, at *5 (holding that

38

punitive damages were warranted where a supervisor's repeated sexual touching was followed by a management-led campaign of retaliation that included stripping the plaintiff of her accounts and office space). Conduct that is limited to general nastiness or an alleged failure to investigate does not typically meet the threshold for callous indifference. *See McDaniel*, 2024 WL 123456, at *18.

In cases where the plaintiff did not suffer actual physical harm, courts in the Second Circuit commonly award punitive damages in the range of $30,000 to $190,000. *See Thomas v. iStar Fin.*, Inc., 508 F. Supp. 2d 252, 262-64 (S.D.N.Y. 2007) (remitting a jury award of $1.6 million in punitive damages to $190,000, where the defendant failed to investigate the plaintiff's claims of race discrimination and retaliated against him in response to those complaints; the court deemed this behavior to be beyond "mere negligence" and thus awarded punitive damages); *Parrish v. Sollecito*, 280 F.Supp.2d 145, 162 (S.D.N.Y. 2003) (finding reasonable an award of $50,000 in punitive damages where the defendants exhibited "reckless indifference" to the plaintiff's complaints of harassment); *Lamberson v. Six W. Retail Acquisition, Inc.*, No. 99-CV-8053 (DC), 2002 WL 59424, at *6-8 (S.D.N.Y. Jan. 16, 2002) (reducing a jury's $400,000 punitive damages award to $30,000 where the defendants took away a manager's hiring responsibilities in response to his complaints of discrimination).

Plaintiff alleges that he is entitled to $1,719,682.10 in punitive damages, which is approximately ten times Plaintiff's demanded compensatory damages of $169,367.80. (*See* ECF 51, Mot. for Default at 37.) Plaintiff asserts that punitive damages are warranted under Title VII and NYCHRL, because on each of the 42 days he worked for Defendant, he reported to managers that his co-worker had sexually harassed, assaulted, and/or touched him without

39

consent, often ten to fifteen times per shift, and the managers responded by laughing; and

when Plaintiff made a formal complaint, he was terminated. (*See* ECF 3, Compl. ¶¶ 4, 7, 25.)[20]

This conduct demonstrates the requisite reckless indifference and evil motive to support

awarding punitive damages. *See, e.g., DeCurtis*, 2011 WL 4549412, at *5 (awarding punitive

damages where an owner was aware of deliberate sexual harassment and failed to intervene).

Plaintiff's request for punitive damages of ten times his compensatory damages would

likely raise constitutional problems and would be inconsistent with the punitive awards in

comparable cases in this District. *See Villalta*, 2021 WL 1458699, at *19 (finding that a two-to-

one ratio was "both permissible under the Constitution and consistent with the established

policies" of the Second Circuit even in cases involving physical assault and lethal threats);

*Munson*, 2017 WL 4863096, at *9 (reducing punitive damages to a two-to-one ratio and noting

that awards exceeding a four-to-one ratio "might be close to the line of constitutional

impropriety"); *Angulo*, 2020 WL 4938188, at *14-15 (recommending punitive damages at a ratio

significantly lower than one to one and observing that a requested four-to-one ratio would

approach the limit of constitutional propriety); *DeCurtis*, 2011 WL 4549412, at *5-6 (awarding

$75,000 in punitive damages against a $100,000 compensatory award to ensure that the award

remained in line with comparable cases).

Although Defendant's conduct is sufficiently egregious to warrant punitive damages, it

does not rise to the level of such extremely reprehensible conduct that warranted a two-to-one

ratio. *See Villalta*, 2021 WL 1458699, at *1, *15, *19 (awarding punitive damages in a two to

---

[20]    This citation refers to the second paragraph 7.

one ratio after characterizing the defendant's conduct – a law firm partner coerced sex for employment, raped and choked the plaintiff while making death threats, and later attempted to suborn perjury by threatening to disseminate revenge porn – as "depraved"); *Munson*, 2017 WL 4863096, at *3, *9 (characterizing conduct as "sufficiently outrageous" where a supervisor repeatedly grabbed an employee's buttocks, rubbed his body against his subordinate, and made sexually explicit comments and awarding punitive damages in a two to one ratio). Accordingly, a ratio of 1.5 to one of punitive damages to compensatory damages is appropriate. *See, e.g., Gavel v. Korang*, No. 20-CV-3475 (LJL) (VF), 2024 WL 4203732, at *7-8 (S.D.N.Y. Aug. 28, 2024), *report and recommendation adopted*, No. 20-CV-3475 (LJL), 2024 WL 4203248 (S.D.N.Y. Sept. 16, 2024) (concluding that a one-to-one ratio of punitive to compensatory damages is appropriate where the plaintiff was subject to ongoing sexual harassment during her employment). Therefore, I respectfully recommend that Plaintiff be granted $120,000 in punitive damages.

## IV. Plaintiff's Requested Attorney's Fees

A prevailing party in a Title VII action may be awarded "a reasonable attorney's fee (including expert fees) as part of the costs" in the Court's discretion. 42 U.S.C. § 2000e-5(k); *DeCurtis*, 2011 WL 4549412, at *6. Similarly, under New York City law, a Court, in its discretion, may award a prevailing party in a discrimination case costs and reasonable attorney's fees. N.Y.C. Admin. Code. § 8–502(g). The plaintiff is the prevailing party where the Court has awarded a default judgment against the defendants, finding those defendants liable under Title VII and NYCHRL. *See DeCurtis*, 2011 WL 4549412, at *6 (holding the plaintiff to be the prevailing party where the Court awarded a default judgment against the defendants, finding those defendants liable under Title VII, NYSHRL, and/or NYCHRL). "[A] reasonable fee is a fee that is sufficient to

induce a capable attorney to undertake the representation in a meritorious civil rights case." *Perdue v. Kenny A. ex rel. Winn,* 559 U.S. 542, 552 (2010). "The Title VII and NYCHRL provisions are substantively and textually similar; therefore, the reasonableness of fees in [a] case would be analyzed the same [way] regardless of which provision provides [the prevailing party's] recovery." *DeCurtis,* 2011 WL 4549412 at *6. As a starting point, a court should calculate the "lodestar – the product of a reasonable hourly rate and the reasonable number of hours required by the case – creates a presumptively reasonable fee." *Millea v. Metro-North R. Co.,* 658 F.3d 154, 166 (2d Cir. 2011).

If Your Honor grants the requested default judgment, Plaintiff will be the prevailing party, and I conclude that attorneys' fees would be warranted. Plaintiff seeks $52,000 in fees for 96 hours of work by his lawyer, Ms. Erin Evers. (*See* ECF 51, Mot. for Default at 38-39; *see also* ECF 51-18, Erin Evers Timekeeping Log; ECF 51-19, Legal Services NYC Attorney Fee Rates, ("Fee Rates").) Ms. Evers submitted Legal Services NYC's ("LSNYC") rates for attorneys, which shows that she has ten-to-fourteen years of experience. (*See* ECF 51, Mot. for Default at 38; ECF 51-19, Fee Rates.) Counsel also submitted a billing statement identifying the dates on which each employee worked, the specific nature of the work conducted, and the amount of time spent. (*See* ECF 51-18, Erin Evers Timekeeping Log ("Time Log").) The Time Log meets the requirements set forth in *Cruz v. Local Union No. 3, Int'l Bhd. of Elec. Workers*. *See* 34 F.3d 1148, 1160 (2d Cir. 1994) (accepting a "typed listing of [attorneys'] hours from their computer records" in lieu of contemporaneous records, where the record showed that the attorneys "made contemporaneous entries as the work was completed, and that their billing was based on these contemporaneous records"); *Johnson v. Kay*, 742 F. Supp. 822, 837 (S.D.N.Y. 1990)

42

("Where the attorneys have provided the court with affidavits that have been reconstructed from contemporaneous records and that set forth all charges with specificity, fees have not been denied.").

A.    Reasonable Hourly Rate

"A reasonable hourly rate is the rate a paying client would be willing to pay." *DeCurtis,* 2011 WL 4549412 at *7. District Court's should look to the "prevailing market rates in the relevant community." *Perdue*, 559 U.S. at 551. "[T]he customary rate for experienced litigators ranges from about $400 to $600 per hour in civil rights actions." *Stanbro Palou Stanbro v. Westchester Cnty. Health Care Corp.*, No. 19-CV-10857 (KMK), 2024 WL 1214560, at *3 (S.D.N.Y. Mar. 21, 2024) (collecting cases); *see also Santander Consumer USA, Inc. v. City of Yonkers*, No. 22-CV-8870 (KMK), 2025 WL 2673773, at *4 (S.D.N.Y. Sep. 18, 2025) (approving hourly rates of $645 and $585 for partners with over 30 and 13 years of experience, respectively, to account for their specialized skill, past awards, and the impact of inflation); *Sanson v. City of New York*, No. 19-CV-2569 (AT), 2021 WL 1191566, at *3, *6 (S.D.N.Y. Mar. 30, 2021) (finding a $600 rate reasonable for a senior partner and a $400 rate reasonable for a junior partner with 12 years of experience in light of the prevailing market rates and the nature of the litigation);

The rate for Ms. Evers falls within the range of reasonable rates in this District. *See, e.g., Santander*, 2025 WL 2673773, at *4 (approving hourly rate $585 for partners with 13 years of experience); *Sanson*, 2021 WL 1191566, at *3 (S.D.N.Y. Mar. 30, 2021) (finding $400 rate reasonable for a junior partner with 12 years of experience); *Feng Chen v. Patel*, No. 16-CV-1130

(AT), 2020 WL 1547457, at *3 (S.D.N.Y. Mar. 31, 2020) (finding that $350 was a reasonable hourly rate for attorneys with "roughly ten years of employment litigation experience").

Because Ms. Evers was the sole timekeeper (*see* ECF 51-18, time log), many of the tasks she performed, such as filing and ECF management, correspondence about the logistics of service, handling technical and account issues, and clerical tasks, could have been performed by a junior lawyer or paralegal at LSNYC's hourly billing rate of $100 for clerical work; she spent about 20 percent of her time on such administrative and clerical tasks. (*See* ECF 51-18, time log at 1-4; ECF 51-19, Fee Rates.)

Accordingly, I respectfully recommend awarding hourly rates of $550 for time spent on legal work (76.8 hours) and of $100 for time spent on clerical tasks (19.2 hours). *See McDaniel*, 2024 WL 5456912, at *19; *Clark v. Gotham Lasik, PLLC*, No. 11-CV-1307 (LGS), 2013 WL 4437220, at *8 (S.D.N.Y. Aug. 20, 2013) (finding that clerical tasks performed by a lawyer "should be compensated at the rate for paralegal[s]" rather than entirely excluded from a fee award).

B.    Hours Reasonably Expended

"The party seeking attorney's fees also bears the burden of establishing that the number of hours for which compensation is sought is reasonable." *Stanbro Palou Stanbro*, 2024 WL 1214560 at *6. A court "must examine the attorney's records that detail the time expended." *Congregation Rabbinical Coll. Of Tartikov, Inc. v. Village of Pomona*, 188 F. Supp. 3d 333, 340 (S.D.N.Y. 2016). A court may exclude "claimed hours that it views as excessive, redundant, or otherwise unnecessary." *Bliven v. Hunt*, 579 F.3d 204, 213 (2d Cir. 2009) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983)). Reductions are also appropriate when, among other circumstances the billing, records contain vague descriptions or block billing that prevent the

court from assessing the reasonableness of the time spent. *See McDaniel*, 2024 WL 5456912, at *19 (recommending a percentage reduction for billing records that failed to provide descriptions sufficiently detailed to enable a reasonableness review).

The Timekeeping Log excludes hours spent on this matter by attorneys other than Ms. Evers, including her supervisors. (*See* ECF 51, Mot. for Default at 38-39.) Plaintiff asserts the fees requested are an underrepresentation of the hours spent on this matter, which supports the reasonableness of the attorney's fee request. (*See id.* at 38-39.)

Courts in this Circuit have found that the reasonable legal hours spent on a default judgment in a discrimination action against a single defendant or a single corporate defendant of modest size and a few individuals typically fall within the range of 25 to 40 hours. *See, e.g., McDaniel*, 2024 WL 5456912, at *19 (reducing the legal hours on a default judgment to 31.8 hours); *Garcia v. Comprehensive Ctr., LLC*, No. 17-CV-8970 (JPO) (BCM), 2019 WL 8274296, at *11 (S.D.N.Y. Nov. 21, 2019) (reducing the legal hours on a default judgment to 24.6 hours), *report and recommendation adopted*, 2020 WL 1435002 (S.D.N.Y. Mar. 24, 2020); *Walia v. Vivek Purmasir & Assocs., Inc.*, 160 F. Supp. 2d 380, 397 (E.D.N.Y. 2000) (reducing legal hours on a default judgement to 32 hours); *Setty v. Fitness*, No. 17-CV-06504 (NGG) (SMG), 2018 WL 8415414, at *19 (E.D.N.Y. Dec. 18, 2018) (finding 29.5 hours for a default judgement to "not appear to be excessive"), *report and recommendation adopted sub nom. Setty v. Synergy Fitness*, 2019 WL 1292431 (E.D.N.Y. Mar. 21, 2019); *Joseph v. HDMJ Rest., Inc.*, 970 F. Supp. 2d 131, 156 (E.D.N.Y. 2013) (finding 24.45 hours reasonably expended in a Title VII default action); *Coronel v. Project Maint., Inc.*, No. 24-CV-8688 (HG) (TAM), 2026 WL 788088, at *14 (E.D.N.Y. Feb. 3, 2026) (finding 37.25 hours reasonably expended in a sexual harassment, hostile work

45

environment, and retaliation default action); *Antoine v. Brooklyn Maids 26, Inc.*, 489 F. Supp. 3d 68, 104 (E.D.N.Y. 2020) (finding 52.25 hours spent on sexual harassment and hostile work environment default case reasonable). Accordingly, I respectfully recommend a 50% reduction in hours for the time spent on legal work, which compensates counsel for 38.4 hours at the rate for legal work and 19.2 hours at the rate for clerical work.

I respectfully recommend awarding attorney's fees as calculated below:

| RECOMMENDED ATTORNEY'S FEES | | | | |
|---|---|---|---|---|
| Type of Work | Reasonable Hourly Rate | Hours Billed | Reasonable Hours | Amount |
| Legal | $550 | 76.8 | 38.4 | $21,120.00 |
| Clerical | $100 | 19.2 | 19.2 | $1,920.00 |
| TOTAL | | 96.0 | 57.6 | **$23,040.00** |

### V.    Pre-Judgment and Post-Judgment Interest

The Second Circuit holds that it is "ordinarily an abuse of discretion not to include pre-judgement interest in a back pay award." *Sands v. Runyon*, 28 F.3d 1323, 1327 (2d Cir. 1994). Back pay should therefore ordinarily be calculated to include compound interest. *See id.* at 1328. "The appropriate rate of prejudgment interest on the back pay award is within the Court's discretion." *McIntosh v. Irving Trust Co.*, 873 F. Supp. 872, 882 (S.D.N.Y. 1995). The methodology commonly used by this Court in calculating the pre-judgement interest is to (1) divide the awards pro rata over the appropriate period, and (2) apply and compound annually the average annual United States treasury bill rate of interest referred to in 28 U.S.C. § 1961. *See Bethel v.*

*Royal Leaf NY LLC*, No. 24-CV-9073 (DLC) (KHP), 2025 WL 3216640, at *12 (S.D.N.Y. Oct. 9, 2025). "Such interest shall be calculated from the date of the entry of the judgement, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgement." 28 U.S.C. § 1961(a).

Plaintiff does not appear to seek pre-judgment interest on his emotional distress damages or punitive damages. For non-economic damages such as emotional distress, the guidance on whether pre-judgment interest is not clear. *See, e.g., Robinson v. Instructional Sys., Inc.*, 80 F. Supp. 2d 203, 207-208 (S.D.N.Y. 2000) (granting pre-judgment interest on award for emotional distress damages); *Angulo v. 36th St. Hosp. LLC*, No. 19-CV-5075 (GBD) (SLC), 2020 WL 4938188 at *19 n.11 (S.D.N.Y. July 31, 2020) (declining to grant pre-judgment interest on award for emotional distress damages), *report and recommendation adopted*, 2020 WL 4936961 (S.D.N.Y. Aug. 24, 2020). And pre-judgment interest is typically disallowed on penalties, including punitive damages. *See, e.g., Board of Governors of the Federal Reserve System v. Pharaon,* 169 F.3d 110, 114-15 (2d Cir.b1999) (distinguishing penalties imposed by an administrative agency).

Plaintiff was terminated by the Defendant on April 19, 2024. (ECF 3, Compl. ¶ 2.) Therefore, I respectfully recommend that Plaintiff be awarded pre-judgment interest on the back pay award only, to be calculated by the Clerk of Court for the period starting on April 19, 2024 and ending on the date of entry of judgment, at the rate set by Section 1961. *See Bethel*, 2025 WL 3216640 at *13 (referring calculation of pre-judgment and post-judgment interest to the Clerk of Court).

Under 28 U.S.C. § 1961, Plaintiff is also entitled to post-judgment interest on his money judgment in a civil case recovered in a district court. Post-judgement interest is "calculated from the date of the entry of judgment, as a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of judgment." 28 U.S.C. § 1961(a). Therefore, I respectfully recommend that Plaintiff should be awarded post-judgment interest on the judgment, to be calculated by the Clerk of Court from the date the Clerk of Court enters judgment in this action (if this Report and Recommendation is adopted) until the date of payment, using the federal rate set forth in Section 1961. *See Bethel*, 2025 WL 3216640 at *13 (referring calculation of pre-judgment and post-judgment interest to the Clerk of Court).

**CONCLUSION**

For the reasons set forth below, I respectfully recommend that judgment should be entered against Slutty Vegan in favor of Mr. Howell, with Mr. Howell to be awarded $242,418.80: consisting of $19,378.80 in back pay, $80,000.00 in emotional distress damages, $120,000.00 in punitive damages; and $23,040.00 in reasonable attorney's fees; plus pre-judgment interest on the back pay award only, to be calculated by the Clerk of Court from April 19, 2024 until the date of entry of judgment; plus post-judgment interest on the judgment, to be calculated by the Clerk of Court from the date of entry of judgment until the date of payment. Plaintiff is directed to serve a copy of this report and recommendation on Defendant, by mail and email at Defendants' last known addresses, and shall file proof of such service on the docket on the day such service is made.

Dated: July 9, 2026
New York, NY

Respectfully Submitted,

ROBYN F. TARNOFSKY
United States Magistrate Judge

**NOTICE OF PROCEDURE FOR FILING OBJECTIONS TO REPORT AND RECOMMENDATION**

The parties shall have fourteen days (including weekends and holidays) from service of this report and recommendation to file written objections to this report and recommendation pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. Plaintiff shall, within two business days serve a copy of this report and recommendation on Defendant by mail and email at Defendant's last known addresses and shall file proof of such service on

49

50

the docket on the day such service is made. A party may respond to another party's objections within fourteen days after being served with a copy. *See* Fed. R. Civ. P. 72(b)(2). Such objections, and any response to objections, shall be filed with the Clerk of the Court. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Any requests for an extension of time for filing objections and responses to objections must be addressed to Judge Rearden.

THE FAILURE TO OBJECT WITHIN FOURTEEN DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *Thomas v. Arn,* 474 U.S. 140 (1985).